Philadelphia School District, Appellant, *v.* Frankford Grocery Company.

Argued November 18, 1953. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*C. Brewster Rhoads*, with him *Donald McDonald, Sidney L. Wickenhaver, Edward B. Soken* and *Montgomery, McCracken, Walker & Rhoads*, for appellant.

*Lloyd J. Schumaker*, with him *Gabriel D. Weiss*, for appellee.

OPINION BY MR. JUSTICE CHIDSEY, March 29, 1954:

In this action of assumpsit the School District of Philadelphia sought to recover the sum of $29,056.03

as additional tax due under a levy made in 1950 upon the gross receipts of the defendant for the calendar year 1949. The tax was imposed under the provisions of the Act of May 23, 1949, P. L. 1669, 24 PS §584.1 et seq., at the rate of 1 mill per dollar on gross receipts. The defendant's gross receipts in 1949 amounted to $29,358,488.33 and it paid tax on $302,464.06 thereof, claiming that the balance represented receipts from the distribution of commodities and services rendered as a purely cooperative association to its constituent members, and therefore not within the purview of the statute authorizing the tax. The case was heard by Judge LEVINTHAL of the Common Pleas Court of Philadelphia sitting without a jury, and after submission of briefs and oral argument to the court en banc, judgment was entered for defendant. The School District appeals therefrom.

The history, structure and operation of the defendant are well summarized from the evidence adduced in the following portion of the opinion of the learned trial judge: ". . . The company originated in 1905 as the Frankford Retail Grocer Association, which name was changed to the present one in 1909. It was formed by a small group of fourteen or fifteen retailers to purchase goods in large quantities and eliminate wholesalers' profits because of chain store competition. The articles of incorporation stated that the purpose of the organization was to act as a purely cooperative enterprise of retail grocers. Every member stockholder in the corporation is obligated to buy sufficient capital stock to cover his average weekly purchases, and to deposit the stock with the company in escrow, and then to pay his bills weekly. This system eliminates credit losses. A member is not obligated to obtain all his supplies from the company. But ordinarily merchandise is distributed only to retail grocer members. Occasionally

it is sold at cost to charities. In some instances a surplus of a commodity is sold on the open market in order to dispose of it. Each member receives only one weekly delivery. The company employs no salesmen and all orders are received by mail or in person on written order blanks. Delivery of merchandise is controlled so that a truck covers a territory without duplication. In making deliveries the drivers deposit the goods on the pavements and do not carry them into the members' stores. Recently the company built a large warehouse to store inventories. A subsidiary corporation was formed for the purpose of holding title to this warehouse. All the stock is owned by the parent company. Capital was acquired by floating bonds which were practically all purchased by the retail grocer members. The goods which the company purchases for distribution are insured by it and title taken in its name. The company provides advertising, accounting and promotion assistance to members. It operates schools to give instruction in the best methods of meat cutting and meat and produce merchandising. A construction department rebuilds stores for members, installs fixtures and display stands and equipment, and services refrigeration equipment. The company also purchases store equipment for members. It has established and promoted a 'Unity' brand name which it owns and which represents a valuable good will. The membership of the company averages 2,050 members whose total sales volume is approximately one hundred million dollars. Officers and employees own about 321 shares of the total number of 12,393 shares of stock outstanding. As already pointed out, the retail grocer members who own the rest of the shares were required to invest in sufficient capital stock to cover average weekly withdrawals. Upon retirement from the organization the member must surrender his stock for its

par value. The same applies to stock held by officers and employees. The withdrawal 'price' of merchandise to retail grocer members is determined as near to cost as possible. Usually at the end of a fiscal year there is an excess of receipts over total costs. This fund is distributed to members in proportion to the withdrawals they have made, as a patronage dividend. A permissive dividend on shares of $5.00 each has also been customarily declared; this dividend also goes to employees who hold shares. The company has some surplus, part of which is in the form of securities of a market value of $304,006.25. This surplus was acquired prior to 1945, since in 1944 an amendment to the charter and by-laws limited the amount which could be added to costs in order to contribute to the fund available for the stock dividend which is paid primarily from the profit on sales and services to non-members. This increment to costs is confined to .003% of the total deposits by members. This limitation is expressly set forth in the application and contract executed by the retail grocer members, and existed in the tax year 1949.".

The Act of 1949 imposing the tax provides: "Every person engaging in any business in any school district of the first class shall pay an annual tax at the rate of one (1) mill on each dollar of the annual receipts thereof.". Section 1 (2) defines "Business" as follows: "Carrying on or exercising *for gain or profit* within a school district of the first class, any trade, business, including financial business as hereinafter defined, profession, vocation, or commercial activity, or making sales to persons within such school district of the first class.". (Emphasis supplied).

In deciding that the defendant was not subject to the tax on the receipts from its member retail grocers, the court below said: "Our conclusion is that this com-

pany is not a commercial distributor in the ordinary sense. It is true that the reason for its existence is a business one in the sense that its function is auxiliary to the retail grocery trade of its members. But the design of its activities is not immediately for profit but rather as an aid in reducing costs in the overall conduct of retail merchandising. The gross receipts of that end result, the business of the retail members, are subject to the tax. To impose the tax also on the intermediate purchasing methods of the cooperative association would seem to us unfair. We look therefore at the substantial characteristics of the company's activities and decide that it is not in business within the meaning of the Act since its function is only an auxiliary one to the retail business of its members. . . The outstanding feature of the Frankford Grocery Company is that it is not organized to make a profit from its activities in distributing goods and services to its retail grocer members. Its functions on the wholesale level are aimed at acquiring benefits on the retail level . . .''.

The plaintiff contended in the lower court, as it does here, that the word "business" as defined in the Act should be given a broad meaning so as to include any commercial activity and not be limited to a business carried on for gain or profit; that the defendant is organized as a business corporation and not as a nonprofit or cooperative association; that its by-laws and contracts with its retail grocer members refer to its activities as "business"; that its receipts exceed cost and hence result in a profit. The defendant admits that it is engaged in business but not in business for profit in so far as its cooperative functioning is concerned. As to the latter, it asserts that the business it conducts is really the business of its constituent retail grocer members who pay the general business tax;

that it must be considered the alter ego of its members or their agent. The defendant's corporate purpose, as stated in its by-laws, is: "The purpose for which this Company is organized and incorporated is to act as a purely cooperative enterprise of retail grocers in the purchasing and warehousing of food and merchandise for its retail-grocer shareholders and to distribute said food and merchandise to them on their respective orders.".

As we stated in *Breitinger v. Philadelphia et al.*, 363 Pa. 512, 523, 70 A. 2d 640, " '. . . The term "business" is of very broad significance and has a great variety of meanings. (Murray, English Dictionary on Historical Principles [1888], vol. 1, part 2, p. 1205; 3 Encycl. of the Social Sciences, pp. 80-86; 5 Words and Phrases [perm. ed.], 970; 13 id. 126, 184.) The precise meaning depends upon the context. . . .' ". We think it clear that business as contemplated by the Act means business for "gain or profit", that is, for profit motive. We cannot subscribe to appellant's argument that the words in the last clause in the Act's definition of business reading "or making sales to persons within such school district of the first class" are used disjunctively as independent of all parts of the definition which precede them, and extend the purview of the Act to sales not made for profit. Such construction requires the anomalous conclusion that all trades, businesses, professions or commercial activities are subject to the tax when they are carried on for profit, but that the only nonprofit operation which is subject to the tax is the making of sales. We incline toward the construction placed upon the clause in question by the defendant, that if it was employed to extend the scope of the tax, it was designed to add to the taxables within the school district carrying on a business for gain or profit, those without the district who made sales to persons within

the district through a sales representative, independent sales agent or resident salesman. If the clause be deemed uncertain or of doubtful meaning, it must be construed in favor of the taxpayer: *Commonwealth v. Repplier Coal Company*, 348 Pa. 372, 35 A. 2d 319. The grant by the Legislature of the right to levy taxes is to be strictly construed and is not to be extended by implication: *Murray et ux. v. Philadelphia et al.*, 364 Pa. 157, 163, 71 A. 2d 280; *Breitinger v. Philadelphia et al.*, supra. Moreover, as hereinafter indicated, we do not think that a sale is involved in the instant case.

The matter thus reduces itself to the question whether the defendant in its cooperative functioning is carrying on a business for gain or profit, and therefore within the purview of the tax. We deem it unimportant that it is incorporated under the Business Corporation Law. We are not concerned with the form but with the substance of its structure and operation in its cooperative activities. That it pays the tax on some of its activities does not prevent immunity from tax on its nonprofit activities (*H. J. Heinz Company v. School District of Pittsburgh*, 170 Pa. Superior Ct. 441, 87 A. 2d 85 (1952)) to the same extent that a nonprofit corporation may be liable for the tax on some of its activities (*Board of Christian Education of The Presbyterian Church v. Philadelphia School District*, 171 Pa. Superior Ct. 610, 91 A. 2d 372 (1952)).

Appellant argues that the taxing Act grants exemption to various types of organizations or persons, including nonprofit religious, charitable or educational corporations or associations, and that the failure to exempt cooperatives indicates that the latter are therefore subject to the tax. It attempts to buttress this argument by reference to the New York City General Business and Financial Tax which exempts *statutory* cooperatives, and suggests that the Pennsylvania Act

was patterned after the New York Act and it must be presumed that the Legislature advisedly made no such exemption. In the first place the cooperative statutory laws of New York are more extensive and quite different from the cooperative statutory laws of Pennsylvania. The cooperative statutory laws of the Commonwealth are antiquated and little used in today's business world and probably for that reason have not been modernized. Defendant does not claim that it is a statutory cooperative nor that it is exempted from the tax which would have the result of excluding therefrom all of its receipts. That defendant does not claim *exemption* from the tax appears from the fact that it has paid the tax on the portion of its receipts derived from activities other than its cooperative functioning. In the second place there is no legislative history which would establish that the Pennsylvania Act was copied from the New York Act. Even if it were concluded that it was so copied, merely on the basis of similarity of language, we do not think the further inference can be made that the absence of an express exemption indicates an intention to include. The Pennsylvania Legislature might have considered that it did not want to exempt from tax *all* the receipts of cooperatives, thereby placing the burden on the cooperatives to establish that certain of their receipts were not subject to the tax, depending upon the character of the transactions.

We think there is a persuasive indication that the Legislature did not contemplate the inclusion of cooperatives in that double taxation would result. Each individual retail grocer member would not only pay, as he does, the tax on his gross receipts, but also on his intermediate purchasing methods. In the case of a chain store, the tax is paid only on receipts from

retail sales and not on the purchase, storage and distribution of the merchandise to its retail outlets.

While it is true that the defendant conducts its operations as a corporation, which is the tendency of most cooperative associations today, it possesses all of the attributes of a purchasing cooperative. In their present form and mode of operation, purchasing cooperatives are of comparatively recent origin and, like all cooperatives, they are somewhat of a hybrid, partaking both of the nature of a corporation and of a partnership. But basically a purchasing cooperative acts as the joint agent of all its member principals in purchasing in bulk and distributing at cost the products sold by its members. That it also acts as such agent in supplying at cost equipment and services incidental to and in furtherance of the economic objectives of its principals, does not change its character. By means of this principle of unified action the merchants secure the advantages of quantity buying, eliminate wholesalers' profits and attain a position where they can compete on even terms with the giant grocery chains. Viewing the defendant as an enterprise separate and distinct from its members, it has what superficially resembles a profit, that is, an excess of receipts over cost of operation. Realistically, however, the apparent profit is due entirely to the fact that each cooperator has paid in more than enough to cover the cost of the products he obtains for himself. By reason of the contract between the organization and each cooperator, this money belongs to the latter. When a group of individuals enter into an agreement to pool their resources for a common purpose and state therein that their contributions to the extent not required for that purpose shall be repaid to them, it is hard to conceive how the contributions returned to them should be regarded as a gain or profit to the entity acting as

their mutual agent. The activities of the agent are the activities of its principals with the result that it is the retail grocer members who are purchasing the merchandise, storing it, distributing and selling it at retail, and they are the parties who realize the profit from the sale to the ultimate consumer. They owe and pay the tax on their gross receipts. Surely reimbursements or advancements made by them as principals to their agent for merchandise purchased by the agent for them are not subject to the tax. Indeed this is recognized by the School District in the regulations covering taxability under the Act.

Thus in Article III, Section 311(d) of its regulations it has excluded from the tax money received by an agent for the purchase of property for his principal, except to the extent that the agent deducts a commission therefrom, and by Section 303(d) and (j) permits the exclusion of receipts by an agent in reimbursement of advancements made by him on account of his principal. Section 311(a) excludes from the tax money received by an agent representing the proceeds of property sold for the account of his principal, the agent being required to report as taxable receipts only commissions retained by him from such monies. Similar exclusions are made with respect to commodity brokers, insurance agents and real estate brokers. Certainly there is more reason for subjecting to the tax the receipt of money by the ordinary agent from his principal than there is for subjecting to the tax defendant's receipts from its retail grocer members covering withdrawals of merchandise. The ordinary agent or broker has an independent profit motive in the funds going through his hands, for the more of his principal's money he receives, the more commission he will earn. On the other hand, the defendant has no independent profit motive or interest in any of the monies it receives from

its retail grocer members covering the cooperator's withdrawal of merchandise.

Conflicting views are expressed in the appellate courts of other States as to the tax status of cooperatives under the particular state statutes involved. Confining ourselves to the Pennsylvania statute here in question, we are of the opinion that the defendant in its cooperative functioning is not conducting an independent business separate and apart from its constituent members, and its receipts from them in payment for their withdrawal of merchandise purchased for their account, are not taxable.

Judgment affirmed.